Since you have a lot of lawyers on both sides, will you be the only one to be arguing, or are you going to be dividing your time, or have you made that determination? Yes, good morning. My name is Tammy Sifis from Kirkland, and I was on behalf of Appellate Nippon Airways Corporation. I am going to be splitting my time with Mr. Malone, who is counsel for ANA, and I'd like to reserve two minutes for rebuttal. Okay. As you know, this is always tricky, so you'll need to work with each other. I don't know what your signals are, but we'll do our best to help you. We're going to roughly divide it in half. What do you do? I'm going to try to take eight minutes, and Mr. Malone is going to try to take seven, but I realize it's not a perfect science. Good luck. Thank you. There is no dispute here that the DOT was granted regulatory authority over each of the airfares to surcharge that issue. Rather, the narrow issue before the court is whether the DOT nevertheless effectively abdicated that authority over both unfiled fares and second fuel surcharges. The district court's decision concluding that the DOT has effectively abdicated its authority over fuel surcharges and unfiled fares marks the very first time a court has ever found effective abdication under this court's authority, now for 2017. The court reached this unprecedented conclusion despite two important findings. First, the DOT in Congress's own statements confirming that the DOT retains regulatory authority over all the rates and surcharges at issue. And second, that the fact that the DOT continues to exercise that authority to this very day. Do you agree? I'm just going to use language that Judge Breyer did. You've got three different categories here. Is it your perspective that this is, your argument is strong for each of them, or are you thinking stronger with respect to one and less so with some of the others? I mean, like fuel charges versus airfares, that sort of thing. So, with respect to those rates that were required to be filed, as you know, Judge Breyer, and how Dr. Dr. applies, with respect to surcharges, we believe it is very strong. I would say it's also very strong under the precedent of this court with respect to unfiled fares as well. And let me address them in turn. With respect to fares that are not filed, before 1999, for decades, the DOT required all fares to be filed. Congress then gave DOT the ability, the authority, to exempt certain tariffs from being filed. In the exercise of its discretion and authority in 1999, after looking at the market, the court determined that we're going to set up a system where there are some rates that need to be filed and some rates that don't need to be filed. Importantly, at that time, in 1997, the DOT said, by setting up this scheme, we are non-materially lessening our authority, and in fact, have always, indeed, the authority to block an unfiled fares. Importantly, the plaintiffs want this court to find that in 1999, when this system was set up, that there was effective abdication over unfiled rates. Perhaps that could be the case if the DOT didn't do anything thereafter, but they did. In 2005, they went again, looked at the regime, and made some adjustments, which countries should be in A, which should be in C. Importantly, and we highlight this in our brief, the DOT augmented some of their filing requirements. For example, Argentina, which was originally A, meaning no filing, was moved into B, meaning filing started to occur. That's not the only thing that happened. Additional countries were added. Two additional countries, Libya and Iran. Thereafter, in 2008 and 2012, the DOT again took a look and reassessed, and said, where should these different markets fall, A, B, and C? So the DOT has stated its authority, and they continue to exercise it. Turning now to you. Did it ever exercise the authority in such a way as to call into question whether any given fare that had been filed, or that was not filed, any given fare, was fair or reasonable? Directly, no. The complaint process does exist for a consumer to bring complaints to the DOT. In fact, in 1997, when the government, when DOT was establishing this system, they expressly said we're relying on competitors and consumers to bring complaints to us. So that direct complaint hasn't been brought to them. As you know, the complaint process has been used in the context of fuel surcharges. With respect to fuel surcharges themselves, like with fares, the DOT has been granted authority over fuel surcharges and has exercised it. In 1999, the DOT expressly stated that all surcharges must be filed. Between 1999 and 2004, several carriers attempted to file separate fuel surcharges. For example, China Airlines and Philippine Airlines. And the government, exercising their authority, said, sorry, no, we don't allow separate fuel surcharges. It disapproved the request. When were these files made, between China Air and Philippine Air? So the China Air one is in Excerpts of Record 226 to 227. That was, I believe, in 2000. And the Philippine Airlines one was also in that same time frame as Excerpts of Record 405. Thereafter, the plaintiffs take the position, and Judge Breyer agreed, that in 2004, perhaps there was the effect of abdication over fuel surcharges. Perhaps that could be the case if the DOT did not continue to regulate when, in fact, they did. I'd like to direct the court to 2005, where E&A attempted to file a surcharge, and the government, in a fair tariff, not in a general rule, which is a procedural mechanism for filing. And the government rejected, disapproved the surcharge filing, and cited back, with a reference to its 1999 system, and said, and I quote, all surcharges are to be filed in the general rules. There is nothing permissive about that statement. It does apply, everybody. That's correct. Excerpts of Record 396. Excerpt what? Excerpts of Record 396. Thereafter, as you know, as reflected in the record, carriers have filed their surcharges, mostly through general rules. And, as I mentioned previously, there is a complaint process. And that complaint process has been used, particularly by a person named Mr. Edelman. And one of those complaints against British Airways, in part, is complaints that the fuel surcharge British Airways was charging was not commensurate with costs. The DOT, in the exercise of its authority, asked British Airways to submit to it data, cost data, to justify its fuel surcharge. The DOT looked at it and assessed Mr. Edelman's complaint. Do you have a record of sign for Mr. Edelman's complaint? I do, ER 99 through 106. Thank you. So, in light of this Court's authority, we have authority granted through Congress to the DOT, undisputed. Judge Breyer found that. Now, the question is, is there effective application? There is not, because the DOT has expressed that they have authority, and they have exercised it. Now, I've also said, with regard to the fuel surcharges, they say that they couldn't effectively monitor that, so they weren't going to. So, Your Honor, that comment was in the context of advertisements. So, fares are submitted into ATP Go in one section, and fuel surcharges, as required by the DOT, are supposed to be filed in general rules. Those are separate in the system, and that comment, in our opinion, looks at whether they could effectively monitor the tethering of a particular fuel surcharge to a fare in the context of advertising. But the broader point, I mean, the whole source of this doctrine is the premise that these fares are fair and reasonable, or the surcharges are fair and reasonable. Growing out of a day when the agencies actually submitted the fares, those days are gone. The premise remains. And if the government is saying, well, we're not going to let you suggest that we've got our stamp of approval on here, why is it that we should continue to apply the premise that the fares must be fair and reasonable, because the agency hasn't said otherwise? Because the agency is saying, well, no, we can't. So, a couple of things. With respect to the government approval statement, that is a statement about whether it's a government-imposed surcharge. Second of all, with respect to the filed rate doctrine, this court has said in Gallo and other cases that an entirely market-based regime where there is no purview, although the authority is still indeed with the agency, is still subject to the filed rate doctrine. Do you agree that the filed rate doctrine is a judicially created doctrine that was designed to address the point that my colleague made, that when the rates were all regulated and they were, in quotes, fair and reasonable, this was the fair tradeoff? Do you agree with that? I don't believe it's that narrow. I believe the filed rate doctrine exists to carve out just one remedy, which is damages in the civil context. Travel damages. Travel damages in the civil context. That's it. That's the only thing that it carves out, and it's there principally motivated by debt threats to an agency. For example, fuel surcharges after 2004 were actually approved in the system by DOD. If this court were to let the case go back down and to continue forward, Judge Breyer would be asked to second-guess the fuel surcharge that was already approved. The fact of a fuel surcharge, easy for me to say, was approved by DOD, but there's no indication that they're actually looking at the numbers that were charged customers for those fuel surcharges. I think, respectfully, I disagree with that. I think we don't know what determinations they're making back at the DOT in Washington when they look at these fuel surcharges. We know that they approved them in their discretion. They have the authority to do that. I see that I'm losing time quickly, and so I apologize. Your partner over there is going to die. They'll be a surcharge. Thank you, counsel. Good morning, Your Honor. Good morning. In the name of the court, my name is Gary Hall. I'm with Constantine Kittenden, representing Appellant 8A. If I have extra time, I'd like to reserve two minutes for rebuttal. I think we've gathered two of you together for your rebuttal, and it's all gone. I'll try to make it to a great tune. But 8A is in a unique position. 8A is the only one of the appendix that was required to file a law on its flights and dinners, and it did. But the unique part of the 8A case is the fears of discounted fares, which nothing was told to DOT about as most of the concern. That's correct, Your Honor. And the Supreme Court has actually said, in that situation, the filing rate doctrine applies without restriction. That issue of fares, DOT never knew about. Yes, but the Supreme Court dealt with that very issue in the central office case, which was signed, Your Honor. In that case, the carrier actually negotiated discounted rates that were revealed to the regulatory agency. And the Supreme Court said, even in that instance, in which you might even get a misrepresentation about what the rates are, the filing rate doctrine still applies. Even in the future, when it comes to the court called the homebound fares and stuff, do you say that applies to that situation as well? I'm sorry, I didn't get the question. I think Judge Breyer referred to the homebound fares as a special discounted rate, because for Japanese ancestry folks, that's what you're talking about, right? Exactly, Your Honor. And in a precise situation, it was dealt with by the Supreme Court in the central office case, when it said, it doesn't matter if the carrier negotiates different rates, either through contract or you might get a misrepresentation, the filing rate doctrine still applies. And going back to the central seating integration, in the Mason case, in which discounted rates were negotiated and the argument was made, well, it would be inevitable then to hold the consumer to paying these discounted rates. I want to make sure I'm on the central office case. I understand there's a Ninth Circuit case by that name. Is there a Supreme Court case by that name?  The Ninth Circuit actually said, because, you know, essentially different services here are being negotiated, that the agency was aware of that the filing rate doctrine would not apply, which the Supreme Court said, but the filing rate doctrine still applies, because the whole purpose of the filing rate doctrine is to say that the filed rate is the only legal rate, that's the only rate that can be the subject of any legal action. Because the AT&T versus central office is located. So I'm not sure I know which one you're talking about. Yes, and with respect to the bill surcharges, I will just point out, Your Honor, that the AT&T bill surcharges were reduced by the DOT on page 2 of our compiling. We have an example of a tariff that was submitted to the DOT. The DOT actually, you can see stamped, approved on it. So the AT&T is looking at the subpoenaed surcharges. Where is that on the record, please? That's on the record site, Your Honor. It's AR-671, is what it says on the brief. Do you know? Yes, that's the AR-671. Is it in the pictures? Yes. I think it's in the pictures. And just briefly, with respect to the bill surcharges, Your Honor, I'll point out that Judge Breyer misconstrued Gallo, because Gallo dealt with a situation in which the market-based rates, Gallo distinguished that situation from actual file rates. And this Court in Carlin says, Gallo pointed out, that in the Supreme Court's D case, the Supreme Court said that in actual file rates, the file rate doctrine applies even if the agency has never investigated or approved those rates. So even if Judge Breyer were right, and with respect to the Supreme Court's principles recognized by Carlin, the file rate doctrine still applies because these were actual file rates. I regret to tell you, but your time is up. So we'll hear it now from the other side. Thank you. Thank you. Good morning. My name is Stephen Williams. I represent the field of evidence in this case. Judge Breyer's decision was correct as to each of the three categories in which the file rate doctrine was thought to be applied. Judge Breyer followed this Court's guidance in Gallo, this Court's guidance in D, and this Court's guidance in Carlin. One thing I want to know briefly is that the file rate doctrine is an affirmative defense. It was raised in the motions at this stage, and Judge Breyer invited the defendants, which is the seat of the views of the Department of Transportation to let's see what they said. That is a relevant factor, and they never did so. The only evidence that was put forward to the district court was put forward by Dinelli's. That's what DOC did. I was interested in what Judge Breyer was suggesting, but is there anything in the record that shows you can call up the DOT and say, I want a ruling on X? Not a ruling, but you can solicit the views of your honor. Yes, my committee officially solicits the views of any person who can write, and they will give you their views. Yes, your honor, I believe it's called a Julian request. They may make a request of a regulatory agency for their view, and solicit that view. In fact, there's a reference to the tram declaration in the record, which reflects that as to an unrelated issue,  with plans. And may I ask you, here we are in 2017, unbelievably at what point in the year did Judge Breyer ask the defendants to seek the views of the DOT on this to be requested? I can find that. I would imagine 2008 or 2009. The case was filed in 07. It was a 2009 decision. The motion is dismissed. Okay. We're turning now. First of all, Judge Breyer, in his decision, he reviewed this court's decision in Gallo, and this court's decision in Gallo, surveyed the history of the following doctrine, the authorities that have been enhanced by both this court and by the Supreme Court, and he stated the standard as follows. This is a quote from Gallo. To the extent Congress has given an agency authority to set rates, and the agency has exercised that authority, such rates are just and reasonable as a matter of law and cannot be collaterally challenged. That's a statement of the following doctrine. This court in Carlin, again, surveyed the decisions of this court and the Supreme Court and stated the proper inquiry was whether the regulator was doing enough regulation to justify a branch of the claims. If I recall, Judge Breyer's approach, he seemed pretty clearly on board with your opponents up to 2000, and then he seemed to see a change in the, both apparently the philosophy and the actual actions of the DOT from that point onward. Do you agree with that? I do, and I can tell you why here. Okay. It really comes from what this court's intended to do, to address the situation involved in the communications industry, specifically telephones and specifically prior to taking the FCC that sought to limit the necessity of filing of tariffs, a Congress that had not been given the duty of observing the FCC's authority, a Congress that amended the Communications Act and in the FCC, you have the power to not require the filings and the FCC exercised that power. And what's critical about what happened in this case around 2000, I think it was a 1995 announcement, and then 2000 was when I added the International Air and Transportation Competition Act was passed, what Congress said to the Department of Transportation was, you don't have the power to choose whether or not carriers have to comply with various forms of economic regulation in this country. And one of those matters that the FCC was given the ability not to require any longer was tariff filings. And the reason why was what the Senate report said in support of the bill was we put those conditions in place back when we didn't trust the free market competition to set fair rates. But we don't think that really is appropriate anymore. We think that the marketplace should set it free. And I think it's also worth noting that unlike him, unlike the communications industry, unlike in natural gas where there's pipelines, this was never an industry where there was a monopoly and there was no competition. It was rather an industry where foreign governments discriminated against U.S. carriers and de-educated the ability to respond to that monopoly. Let me ask you, since you've raised the concept of the foreign governments, as Brian noted with accuracy, so that whatever the United States did, you have other sovereign nations and some of their sovereign carriers involved here. It takes two to tango with respect to these kinds of things. Is one role, if any, should we give to the role of the foreign states and their sponsoring carriers, if any, in determining whether a final rate applies? Because arguably there may be a rate that's required by those countries. Does that play a role? Very, very clearly, Robert. I think the key point here is in most of these countries there are so-called double disapproval agreements, which means no one country can decide. No one country can govern. And double disapproval agreements, as DOT has said, deregulated. That was the purpose of them. They deregulated these industries. And as Judge Breyer quotes DOT, he quotes from DOT, he says, and even in the countries where we don't have disapproval, double disapproval, there's virtually no regulation. So I think the point of the experts here is finding to that effect, or he was just philosophizing, about there was no regulation in the other countries. I think he was simply citing the Department of Transportation's position on that. And I think the Department of Transportation, delegated by Congress and IATCA, to go out and negotiate with foreign countries for free, open, and fair competition in international air transportation is entitled to deference and has to its view that that is not an effective policy. So going back to Ting, DOT took the power that Congress gave it to say, wait, the filings are not required. Don't require them. Don't regulate them. And that's what it did. And that's why for all of the such things for which there's no filing requirement, it is squarely within this Court's holding in Ting that the following actions really apply. There's no regulation. They were given a grant, but they were told you can exempt carriers from this grant. They did so. They're not regulating it. Is it your position that because you gave the example of the telecommunications industry, then you gave the example of the air carrier industry? It all occurred around 2000. There was an administration change about that time a little bit later. But is it your view that because the Congress changed the law with respect to each, but that's really the line of demarcation as to when the final right doctrine should no longer apply? Because these air regulating agencies, in this case, DOT was given the authority to not require any of this. And you're saying they did, and therefore it doesn't apply. Is that right? Well, I think first I'd say earlier that I look at it industry by industry. The statute governing the industry and the actions of a regulator are unique under the facts of each case. The deregulation motion, to me, began to apply to a number of industries throughout the 70s and into the 80s. And you know, although the statutes we're looking at were called deregulation acts, but particular to this industry, I do believe the goal was to eliminate regulations, to let competition set rates and not regulation. I think the Congress was careful to give the DOT the power to act as itself and to accomplish that goal. And it did so. I mean, it's fine once you review the viability of the final right doctrine today, are we as part of our role to consider what the record shows about whether or not competition is what's regulating the air traffic international air traffic industry, or are we simply to do as I understand your opponents to say, if the DOT has the authority to regulate and anybody got regulated during that time, that's the end of the story. I think you need to look at, not as competition to it, it is rather, what is the congressional direction to the regulator? What is the regulator doing with that congressional direction? I think it has to be focused on the statute and the regularity that places it. And I want to respond to a few comments we argued about what DOT did, because that was really as to much of this, the question before Judge Breyer, what is the regulator doing? Unlike in the snow in Michigan, there is harbor in Gallo, and even in other pieces where parties were able to point to specific things that might further analyze the market to turn into these actors have market power, such that they could have to unilaterally to raise rates in conducting investigations that are required of violence and changes in condition by those market actors. All that's been pointed to here, it's not any other country's issue here, but rather Argentina, Libya and Iraq had some change. I would submit that doesn't govern whether or not these airlines in different countries are entitled to any protection from the fall rate doctrine. Well, what's wrong with the process of, of having this differentiation? It strikes me as, as pretty logical. You assume you'd be putting it down as not persuasive. Why is it, why couldn't they just not only change around the groups where countries are, but allow complaints to be used and other means to achieve their goal? Excuse me, you were indicating these changes that they were making in these sections are really immaterial. I would imply. I wouldn't say they're immaterial so much as I would say that they don't meet the standard of Gallup and Carlin to show that the regulator has done enough to justify taking power away from the federal courts and changing the claims here. And I think that is what Gallup said that Carlin wasn't, but that was, it was in the 30 year era that it was just explaining to us how we're going to go down less, how we're going to have more competition. So why can't the regulator then respond to that by having these different areas? We'll put them in and, and to look at different things, allow the complaint process to be used because they have so many assets to use. What's wrong with that? I don't suggest something's wrong with that, but what I would suggest is it's not sufficient in particular as to the argument that was made on this point about these countries that don't file anything. And a regulator that is not controlled to do anything, to then see that a federal court lacks the power to adjudicate an empty trust claim. That means the critical issue is as Gallup and Carlin say, is the regulator doing enough such that we should impose a traditionally created principle that takes powers away from federal courts to adjudicate empty trust claims. I assume that here, treating different countries differently, they're not an issue on this appeal. We're talking about the airlines issues. And as to the complaint process, it's never been used ever to adjudicate just unreasonable rates. And an argument was made about that. And, you know, I want to be very clear about that complaint, which is the only evidence that was submitted. The hell has brought such a significant effort to it, which when the DOT said, you may now, at least Judge Breyer was correct in saying you may, you don't have to. You may file these things for field searchers, for field searchers separately, but don't say they're government approved. This has to be certain. And I think that's a critical point because really to me, the fundamental core of the following doctrine is, if either it's applied with a filing or if it's applied to argument, it's just the fundamental core is that's indeed, to me, a government approved claim, not as was argued to be a government, a closed rate by government approved. Right. Depending on the, depending on whether the antitrust proceedings could go forward. Are you saying that under the file rate doctrine, that there can be no antitrust claims at all, as opposed to triple damage claims? As I understand the file rate doctrine, when it applies, it bars damage claims. It doesn't bar injunctions. So I don't want to get cut out on those. The DOT's power to adjudicate claims about rates is in section 415 on how it was approved, not in section 114 on how it was approved. And DOT could have transformed that to a just and reasonable rate proceeding, but they didn't. Let me ask your opinion of Judge Breyer's decision. He granted a pardon, denied a pardon, defended his motion for summary judgment, indicating he did not bring a motion for summary judgment. Is that correct? That is correct, Your Honor. He spoke in seemingly definitive terms with regard to whether the file rate doctrine can be used here by defendants to shield them from a civil liability award. Is that an ultimate adjudication? I mean, suppose DOT finally signs off or is there room for evidence to be submitted with regard to whether, in fact, there has been effective application by the agency? Your Honor, I agree you've spoken definitive terms, but I think the way we view it is he was applying the summary judgment standard. And really, the issue is viewing all the facts of the record, the claim was favorable to the non-moving party. Was there a basis to say that the claims did not go forward? And he concluded that there was not. So you're not asking us to affirm a test in summary judgment in your favor on any issues? Because you're still on the table. Yes, Your Honor. I mean, so I'm sticking to what Judge Breyer, I admire Judge Breyer. I think he's a very smart judge. And I like him. And he, he's a good, nice person. So I have nothing against him, but it just seems to me he was running the train a little fast on this one. What's your position on, I understand it's much easier in these cases to get a bunch of offers and get a summary judgment and try the rest. But is, is anyone objecting to the process itself? And if so, what would be the basis? I am not aware, Your Honor, if I understand the court's question of anyone objecting to it on that basis. I think maybe from the perspective of the parties in the court, this is a 2008 case, which had an exhaustive period of discovery of, of counsel and witnesses all over the court. And those, even from the witness record, as you can see from just the part that's before you, I think from our perspective, he gave the proper considerations to the facts after the, I guess, six, seven, eight years it took us to get from the filing of the complaint to the summary judgment hearing. This was very speedy. And, and I, and I thought, yes, I'm just wondering whether he, I know where he was going. I admire what he was trying to do, but do we have a force review in our country? Or are we limited by just the issues that have been brought before us by the parties? Your Honor, my suggestion would be that the court should be limited by the issues placed before it by the parties, the record before it, certainly because why, why are we limited by the issues? Well, I think, Your Honor, my view would be that the issues for review by the court are the matters for which the defendant sought to have summary judgment and do it in your favor. That frames the issues before the court. I recognize that there might be other grounds for which this court could rule other than just the ones raised by Judge Breyer, but I don't think they'd be drawn to the scope of questions presented in the record before the court. Bottom line, I think both parties are saying, does defiled rape doctrine still apply? And if so, under what circumstances? I mean, as the record shows, is that correct? I think that's fair. I think the only way I may, might get in the books to that would be whether or not the, the prevalence and rebirth of demonstrating through these ads, that it should apply to parties is understood. Now, we have a situation where both of you have used up all your time. I'm just going to ask my colleagues, do either of you have any additional questions, either of this gentleman or of the other parties? Or do we have what we need? We can go for hours, but I don't think it's a waste of time. They saved some time. They went over. I think we're going to thank all of you for your fine arguments, your fine briefs. You can appreciate this. My colleague mentioned a minute ago, we could go on for hours and hours and hours, but in this case, as you all have done for years and years and years and years. And we'd like to. And we would like to, but I think with the fine briefs and your arguments, we have what we need. We thank you all. The court stands in the recess for today as adjourned for the week. Thank you. Thank you.
judges: Wallace, Clifton, M. Smith